UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| TIM ALLEN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:17-cv-00222-SEB-DML ) |
| AMERICAN COMMERCIAL BARGE LINE LLC, | ) ) ) |
| Defendant. | ) ) ) |
| AMERICAN COMMERCIAL BARGE LINE LLC, | ) ) ) |
| Counter Claimant, | ) ) |
| v. | ) ) |
| TIM ALLEN, | ) ) |
| Counter Defendant. | ) |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause is now before the Court on (1) the Motion for Summary Judgment [Dkt. 64] and Supplemental Motion for Summary Judgment on Conversion Claim [Dkt. 77] filed by Defendant and (2) Counter Claimant American Commercial Barge Line LLC[1] ("ACBL") and the Motion for Summary Judgment [Dkt. 69] filed by Plaintiff Tim

---

[1] Defendant is named in the caption as "American Commercial Barge Line, LLC," but has informed the Court that there should not be a comma within the entity's name. Accordingly, Defendant's name is changed to "American Commercial Barge Line LLC" in the caption and on any future filings.

1

Allen. Mr. Allen brought this lawsuit against ACBL, his former employer, alleging various state law claims, including claims for breach of contract (Count I), defamation (Count II), and conversion (Count III).[2] ACBL has filed a counterclaim for breach of contract (Count I), trade secret misappropriation under the Indiana Trade Secrets Act ("IUTSA") (Count II), tortious interference with contract (Count III), and declaratory judgment (Count IV) against Mr. Allen. We have jurisdiction under diversity of citizenship. 28 U.S.C. § 1332(a)(1) (diversity jurisdiction exists "where the matter in controversy exceeds … $75,000, exclusive of interests and costs, and is between … citizens of different States").

ACBL seeks summary judgment in its favor on all of Mr. Allen's claims as well as on Count I of its counterclaim for breach of contract. Mr. Allen, in turn, has moved for partial summary judgment on his breach of contract claim as well as on Counts I and II of ACBL's counterclaim for breach of contract and trade secret misappropriation. For the reasons detailed below, we <u>GRANT</u> ACBL's Motions and <u>DENY</u> Mr. Allen's Motion.

**Factual Background**

Mr. Allen was employed by ACBL on two separate occasions. From 1987 to 1993, he worked as a sales representative in ACBL's liquid sales department. Then, from 2005 to 2016, Mr. Allen worked for ACBL as Director of Liquid Sales and Vice President of Liquid Sales, both of which are senior management positions. During his

---

[2] We previously dismissed Mr. Allen's claim brought pursuant to the Indiana Wage Payment Statute.

employment with ACBL, he sold barge transportation services and directed the negotiation of thousands of contracts as the head of an eight-member team.

**The ACBL-Statoil Negotiations**

In early 2015, Mr. Allen represented ACBL throughout ninety days of negotiations for a master service agreement with energy company Statoil Marketing & Trading (US) Inc. ("Statoil"). Those negotiations resulted in the signing of the Master Liquid Cargo Contract between ACBL and Statoil (the "ACBL-Statoil Contract"), which included a confidentiality provision prohibiting the disclosure to third parties of the terms and conditions of the contract. Mr. Allen was not responsible for drafting the agreement, but he did review and comment on the various iterations of the contract throughout the negotiating process. According to Mr. Allen, this contract used terms and conditions "standard in the industry that any other carrier would apply the same way." Allen Dep. at 15.

**The Parties' Severance Agreement**

On December 29, 2016, due to restructuring of ACBL's senior staff positions, Mr. Allen executed a Severance Agreement and Release (the "Severance Agreement"), voluntarily terminating his employment in exchange for certain severance benefits to be paid out over time. Specifically, pursuant to the terms of the Severance Agreement, ACBL promised to provide Mr. Allen his normal weekly rate of pay based on his annual salary at the time of his termination for one full year, along with any vacation and other paid leave he had accrued. These terms were in line with ACBL's salaried severance policy that provides benefits based on the severed employee's length of employment.

As consideration for those severance benefits, Mr. Allen agreed, *inter alia*, to comply with non-disclosure obligations regarding ACBL's confidential business information, including refraining from using or disclosing any such information and immediately returning any property of ACBL, including confidential information, which might subsequently come into his possession. The Severance Agreement provides that the non-disclosure obligations do "not apply to information that is in the public domain or that becomes part of the public domain through no fault of Employee's." Severance Agreement and Release, § 5.3.6.

> The Severance Agreement, defines "confidential information" as follows:
>
> any information of any kind, nature or description concerning any matters related to the Released Parties which are not generally known or readily accessible to the public and which, if divulged, disclosed or otherwise communicated to a person or entity other than the Released Parties or their agents or employees, would be deemed by a person exercising reasonable judgment to, or likely to, adversely impact or affect the Released Parties' business interests or to aid or assist a competitor of the Released Parties. Confidential information includes, but is not necessarily limited to, information pertaining to the Released Parties' products, services, business procedures, marketing plans, customer lists, inventions and other information, as well as all other trade secrets, intellectual property and information proprietary to the Released Parties including, but not limited to, information pertaining to strategies, finances, sales, markets, business plans and methods, future business plans and methods, future product and services, discounts, profit margins, wholesale prices, identities of existing and prospective customers, suppliers and vendors of the Released Parties (including lists thereof), and technical information pertaining to the Released Parties' business, products, services, manufacturing practices and techniques, tooling, machinery, fixtures, formulas, compositions, research and computer programs.

*Id.* § 5.3.6.1.[3] The Severance Agreement further provides that "[i]nformation that arguably meets the above description [of confidential information] shall be deemed 'confidential information' under this Agreement, regardless of whether it has been stamped, marked or otherwise expressly identified as such." *Id.* § 5.3.6.2.

Mr. Allen admits that he read and understood these non-disclosure obligations at the time he signed the Severance Agreement. The Severance Agreement specifically provides that Mr. Allen's compliance with the non-disclosure obligations is material to ACBL's performance of its contractual obligations. *Id.* § 5.3.

**The Statoil-Kirby Negotiations**

A few months after his departure from ACBL, Mr. Allen began working as a broker for Omega Partners ("Omega"). His duties in that position included arranging deals between barge carriers and customers needing commodities shipped. In this capacity, he was approached by Kirby Inland Marine, LP ("Kirby"), one of ACBL's competitors, to negotiate a master service agreement with Statoil, his former ACBL customer. It is standard in the barge industry to begin negotiations with a draft contract, originating either from the shipper or the carrier. Kirby sent Statoil its own Master Agreement of Affreightment as a draft to use to open negotiations. Instead of using

---

[3] Throughout this Order, we cite to portions of the sealed Severance Agreement that are relevant to resolving the parties' cross motions for summary judgment. The parties too have quoted excerpts from this sealed material in their briefing on these motions. We are not aware, therefore, of any reason that this Order should be sealed. If the parties disagree, they should notify the Court forthwith.

Kirby's draft contract, on June 21, 2017, Statoil forwarded Mr. Allen a version of the ACBL-Statoil Contract to serve as a starting point for its negotiations with Kirby (hereinafter, the "Statoil Draft").

The only substantive difference between the ACBL-Statoil Contract and the Statoil Draft sent to Mr. Allen to forward to Kirby was that ACBL's name had been replaced throughout the document with generic references to "Barge Company." All of ACBL's contracts have distinctive formatting that distinguish them from other carriers, including "the way the parties' names are identified, the location of the title, the location of the contract number, effective date sort of in a box at the beginning, [and] the order of the sections in general." Gallagher Dep. at 20. The Statoil Draft retained ACBL's formatting characteristics.

Mr. Allen had not drafted the ACBL-Statoil Contract and testified that he was unaware of the origin of the draft Statoil sent him as it did not contain ACBL's name nor was ACBL's name mentioned in the emails he received regarding the Statoil draft. According to Mr. Allen, the Statoil draft was basically a "blank document" containing common industry terms and conditions without any details, including names or rates, that make a contract personal. It also did not contain a completed schedule, which is the attachment to a standard contract that contains details unique to the parties. According to ACBL's agent, Robert Blocker, ACBL's master service agreements include a variety of general, industry-accepted terms and conditions as well as a separately attached schedule that sets forth the particularized details of the deal that pertain to the parties involved. The schedule contains "the commercial terms and conditions relative to the actual

6

volume, rates, and the task at hand relative to the general [terms and conditions] of the [master service agreement]." Blocker Dep. at 39. Although the majority of the details specific to the contracting parties are set forth in the schedule, Mr. Allen testified that certain provisions of the master service agreements, while covering standard topics in the industry, can involve unique negotiations between the parties particularly with regard to risk allocation, insurance, and indemnification. Allen Dep. at 44–47.

Before Mr. Allen sent the Statoil Draft to Kirby, he was assured by Statoil that its legal group had reviewed the draft to make sure it was not a confidential document. Based on this assurance, Mr. Allen viewed the contract given to him by Statoil only long enough to ensure it was indeed a draft contract and not a mistakenly attached document before forwarding it to Kirby. He admits that he also sent the same draft agreement to representatives of Ingram and Enterprise, two other of ACBL's competitors.

**Defendant Stops Paying Plaintiff's Severance Benefits**

ACBL discovered that Statoil and Kirby were negotiating a contract in mid-July 2017 when it received an automated email alert after a Statoil agent inadvertently sent an email to Mr. Allen's prior ACBL email address and again in early August 2017 when Mr. Allen inadvertently copied that same old address into an email sent to Kirby. No one from ACBL notified Mr. Allen of the mistake in the July email. The August email contained two paragraphs from the working draft contract between Statoil and Kirby that Mr. Allen had forwarded without editing. Upon review of the inadvertently sent email, ACBL General Counsel Sean Gallagher believed he recognized some of the language in

7

the excerpted paragraphs, although he was not sure where the format used by ACBL originated. ACBL did not contact Kirby or Omega for an explanation at that time.

Instead, ACBL contacted Statoil between August 7 and August 15, 2017, stating that it was not appropriate to use the ACBL-Statoil Contract with competitors. Statoil originally pushed back, but ultimately agreed to start over with contract negotiations and refrain from using the Statoil Draft. On August 15, 2017, ACBL sent similar letters to Omega and Kirby, outlining Mr. Allen's restrictions and the unauthorized disclosure of what ACBL considered its confidential information. There is no indication that ACBL's letters were distributed to any other parties. In response, Kirby's general counsel sent a letter to ACBL asserting that the contract at issue did not involve "confidential or proprietary information of ACBL." Pl.'s Exh. I. No legal action was taken by ACBL against Statoil, Kirby, or Omega following the dissemination of these letters, and, at least as of the time the parties' briefing was filed, ACBL continued to maintain a business relationship with Statoil.

ACBL's in-house counsel also sent Mr. Allen a letter on August 15, 2017, advising him that ACBL was aware that he had shared the ACBL-Statoil Contract with Kirby and that it considered the unauthorized disclosure a violation of Mr. Allen's confidentiality obligations under the Severance Agreement. ACBL demanded that Mr. Allen cease and desist any future violations and informed him that ACBL was "retaining any further Severance Benefit payments as liquidated damages in accordance with Section 5.4.2 of [the] Severance Agreement." Def.'s Exh. 5 at 1–2.

Once Mr. Allen learned of the similarities between the Statoil Draft and the ACBL-Statoil Contract, he did not send the draft contract to any other entity. In response to ACBL's cease and desist letter, Mr. Allen sent ACBL multiple letters explaining that he had not retained the ACBL-Statoil Contract upon his termination and did not currently have any of ACBL's confidential or proprietary information in his possession, but rather that Statoil had given him the draft contract and had represented it as a document it had permission to use. Mr. Allen informed ACBL that he had simply forwarded the draft to Kirby on Statoil's behalf and that he was unaware of its connection to ACBL because it did not contain any reference to his former employer.

ACBL stopped making severance payments to Mr. Allen in August 2017 and withheld the final five months of severance pay and benefits provided for in the Severance Agreement.

**Plaintiff's Current Employment**

Mr. Allen continues to work for Omega and no disciplinary action was taken against him as a result of his disclosure of the ACBL-Statoil Contract. Mr. Allen also continued his business relationships with both Statoil and Kirby and the compensation he received based on those relationships was not impacted by ACBL's letters to those companies.

**The Instant Litigation**

On November 29, 2017, Mr. Allen filed his complaint in this action, alleging claims for breach of contract (Count I), defamation (Count II), and conversion (Count III). On January 17, 2018, ACBL filed a counterclaim for breach of contract (Count I),

9

misappropriation of trade secrets under the Indiana Trade Secrets Act (Count II), tortious interference with contract (Count III), and declaratory judgment (Count IV). Currently before the Court are ACBL's motions for summary judgment on all three counts of Plaintiff's complaint and its breach of contract counterclaim and Mr. Allen's motion for summary judgment on his breach of contract claim as well as Counts I (breach of contract) and II (misappropriation of trade secrets) of ACBL's counterclaim.

## Legal Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md. 1998). Thus, in

determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached there to, and has construed all facts and drawn all reasonably inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II. Discussion

### A. Plaintiff's Breach of Contract Claim and Defendant's Breach of Contract Counterclaim

Mr. Allen claims that ACBL breached the Severance Agreement by discontinuing payment of his severance benefits after only seven of the twelve-monthly installments provided for under the contract. ACBL rejoins that it was Mr. Allen who breached the Severance Agreement by disclosing ACBL's confidential information in violation of the contract's non-disclosure provisions, and that, by virtue of that material breach, ACBL was entitled under the terms of the contract to discontinue payment of his severance benefits. The parties have filed cross motions for summary judgment on both of these claims.

The elements of a breach of contract claim under Indiana law are: (1) the existence of a contract; (2) a breach thereof; and (3) damages resulting from the breach. *McKeighen v. Daviess Cnty. Fair Bd.*, 918 N.E.2d 717, 721 (Ind. Ct. App. 2009). It is undisputed that the Severance Agreement is a valid contract, and thus, that the first element, to wit, the existence of a contract, has been proven on both sides. We turn next to address the issue of breach.

ACBL admits that it discontinued its severance payments to Mr. Allen after only seven of the twelve payments required under the Severance Agreement but argues that it did so only because Mr. Allen breached the contract first by disclosing ACBL's confidential information in violation of his non-disclosure obligations under the contract. Under Indiana law, a party who commits a material breach of contract cannot seek to enforce such contract or otherwise maintain an action for breach against another who subsequently refuses to perform. *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind. Ct. App. 2001). Thus, the determinative issue here is whether Mr. Allen materially breached the Severance Agreement before ACBL discontinued his severance payments. For the reasons detailed below, we hold that he did.

The undisputed evidence establishes that the draft contract Statoil sent to Mr. Allen—which he concedes he viewed briefly and then forwarded to Kirby as well as to two other of ACBL's competitors—differed from the ACBL-Statoil Contract he had previously negotiated only in that ACBL's name had been removed and replaced with the generic term "Barge Company." Mr. Allen contends that this was not a breach of his non-disclosure obligations, however, because the draft contract did not contain "confidential information" as defined by the Severance Agreement. Alternatively, Mr. Allen argues that, even if the draft agreement did contain confidential information, it was placed in the public domain through no fault of his own because he was assured by Statoil that it was not confidential, and he acted merely as a go-between in forwarding the draft to Kirby. We address these arguments in turn below.

The Severance Agreement broadly defines "confidential information," to include "any information of any kind, nature or description concerning any matters related to [ACBL] which are not generally known or readily accessible to the public …." Severance Agreement § 5.3.6.1. The Severance Agreement also identifies specific examples of "confidential information," including but not limited to "information pertaining to [ACBL's] … services, business procedures, … sales, markets, [and] business plans and methods." *Id.*

Mr. Allen argues that the draft contract he forwarded to ACBL's competitors does not come within this definition as it contained only "standard contract language used in the industry." Dkt. 73 at 14. This argument is belied by the fact that Kirby attempted to use a draft contract of its own at the start of the negotiation process, but Statoil rejected that contract in favor of opening negotiations with the ACBL-Statoil Contract. If, as Mr. Allen argues, the ACBL-Statoil Contract contained nothing more than standard contract language used throughout the industry and was interchangeable with any other draft contract in the barge industry, it would not have mattered whose draft contract was used.

Moreover, by Mr. Allen's own admission, a number of the provisions of the ACBL-Statoil Contract that were also in the Statoil Draft were specifically negotiated between ACBL and Statoil and were unique to their relationship, including the particular risk allocation agreed upon between the companies. Allen Dep. at 44–45. Additionally, Mr. Allen testified that the provisions regarding insurance, confidentiality, choice of law, and indemnification included in the ACBL-Statoil Contract all vary from contract to contract. He also conceded that, in his experience, he had only ever seen the provision

13

regarding consent for voice recording in the ACBL-Statoil Contract and the Statoil Draft. *Id.* at 46–47. Thus, while the Statoil Draft undoubtedly contained certain terms and conditions standard in the industry as Mr. Allen contends, it also included information regarding ACBL's business procedures and methods not generally known or easily accessible to the public.

We find, therefore, that the draft contract forwarded by Mr. Allen comes within the broad definition of "confidential information" set forth in the Severance Agreement. This conclusion is buttressed by the fact that the Severance Agreement specifically provides that information which "arguably meets" the definition of confidential information "shall be deemed 'confidential information' under this Agreement, regardless of whether it has been stamped, marked or otherwise expressly identified as such." Severance Agreement § 5.3.6.2.

Nor are we persuaded by Mr. Allen's second argument, to wit, that the "no fault" provision of the Severance Agreement excuses his breach. The Severance Agreement provides that Mr. Allen's non-disclosure obligations do not apply to "information that is in the public domain *or that becomes part of the public domain through no fault of Employee's*." *Id.* § 5.3.6 (emphasis added). Mr. Allen argues that the Statoil Draft became part of the public domain through no fault of his own because Statoil assured him that it was authorized to use the draft and that the draft did not contain confidential information. Mr. Allen claims, therefore, that any fault for disclosing confidential information lies with Statoil alone.

Mr. Allen knew, however, that he had an independent responsibility under the Severance Agreement to ensure that he was not disclosing ACBL's confidential information and to return any such proprietary information if it subsequently came into his possession. Mr. Allen concedes that he opened the Statoil Draft before forwarding it to Kirby to be sure it was the correct attachment. Although he did not write the ACBL-Statoil Contract, the undisputed facts establish that he was intimately involved with the contract negotiations. In fact, he concedes that he reviewed and commented on various iterations of the contract as it went back and forth between the parties during that time period, and that, as a result, he "became familiar with it." Allen Dep. at 41–42. The evidence further establishes that all ACBL contracts, including the draft contract, use a consistent and distinctive format for its contracts, including a box setup identifying the parties, title, contract number, and effective date at the beginning of the document. Accordingly, when Mr. Allen viewed the Statoil Draft with these indicia that it was ACBL's and then disclosed that document containing the confidential terms and conditions of the ACBL-Statoil Contract to three of ACBL's competitors, he breached the Severance Agreement. Whether he intended to do so is irrelevant. *See Burleson v. Ill. Farmers Ins. Co.*, 725 F. Supp. 1489, 1495 (S.D. Ind. 1989) ("[I]n contract actions the defendant's motive or state of mind is of no moment except where punitive damages are sought.").

Mr. Allen's breach was also material. Generally, the materiality of a breach is a question of fact. However, "where a contract itself provides the standard for what constitutes a material breach, this is the standard that governs." *State v. Int'l Bus. Machs.*

*Corp.*, 51 N.E.3d 150, 161 (Ind. 2016). The Severance Agreement specifically provides that the non-disclosure provisions at issue in this litigation "are material provisions of [the] Agreement." Severance Agreement § 5.4. Accordingly, we hold that Mr. Allen's breach was material.

With regard to the element of damages, Mr. Allen argues that ACBL cannot show that it was damaged as a result of the ACBL-Statoil Contract being disclosed because it continues to maintain a solid business relationship with Statoil and any losses in revenue it may have suffered cannot be traced to the disclosure of the draft contract. However, the Severance Agreement provides that, by signing the agreement, Mr. Allen "acknowledge[d] that [ACBL] would be irreparably harmed by [his] breach" of, *inter alia*, the non-disclosure provisions of the contract. Severance Agreement § 5.4.1. Further, the Severance Agreement provides that, in the event of Mr. Allen's breach, he "shall immediately pay to [ACBL] one half the monetary value of the Severance Benefit as liquidated damages. [He] acknowledges these liquidated damages represent a fair and reasonable assessment of the actual damages [ACBL] would incur as a result of such breach by [Mr. Allen]." *Id.* § 5.4.2.

For these reasons, ACBL is entitled to summary judgment on Mr. Allen's breach of contract claim as well as its counterclaim for breach of contract against Mr. Allen. Mr. Allen's cross motion for summary judgment on these claims is therefore denied.

### B. Plaintiff's Defamation and Conversion Claims

As a result of Mr. Allen's material breach of the Severance Agreement, his remaining claims for defamation and conversion cannot survive summary judgment. Mr.

16

Allen's conversion claim fails because ACBL cannot be held liable for withholding severance benefits to which Mr. Allen was not entitled under the terms of the contract. *See Shourek v. Stirling*, 621 N.E.2d 1107, 1109 (Ind. 1993) (holding that conversion claims require the plaintiff to establish "an immediate, unqualified right to possession resting on a superior claim of title"). His defamation claim likewise fails because he cannot recover under a theory that ACBL defamed him by falsely asserting that he improperly disclosed confidential information in violation of the Severance Agreement when he did in fact violate his non-disclosure obligations. *Melton v. Ousley*, 925 N.E.2d 430, 437 (Ind. Ct. App. 2010) ("[T]ruth is a complete defense in civil actions for defamation.").

    **C.    Defendant's Trade Secret Appropriation Counterclaim**

ACBL alleges in Count II of its counterclaim that Mr. Allen's disclosure of the draft contract to three of its competitors constituted misappropriation of trade secrets in violation of the IUTSA. Mr. Allen has moved for summary judgment on this claim, arguing that he did not misappropriate any information, and, in any event, the draft contract does not constitute a trade secret under the IUTSA.

Misappropriation occurs when there is "disclosure or use of a trade secret of another without express or implied consent by a person who[,]… at the time of the disclosure …, knew or had reason to know that his knowledge of the trade secret was…derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy …." IND. CODE § 24-2-3-2(2)(B)(iii). Mr. Allen argues that he received assurance that the Statoil Draft had been approved by Statoil's legal department

17

and was acceptable to use and he therefore had no reason to know that the draft constituted a trade secret that either Statoil or he was duty-bound to protect.

A reasonable jury could find, however, that Mr. Allen's forwarding of the draft contract to Kirby and two other of ACBL's competitors without ACBL's knowledge constituted a disclosure without express or implied consent. There is also sufficient evidence in the record from which a jury could conclude that Mr. Allen knew both that he had non-disclosure obligations as set forth in the Severance Agreement and also that Statoil owed non-disclosure obligations to ACBL given that he personally negotiated the ACBL-Statoil contract which contained a provision requiring Statoil to maintain the confidentiality of the agreement.

Finally, we cannot say as a matter of law that the draft contract does not constitute a trade secret such that Mr. Allen would be entitled to summary judgment in his favor on ACBL's counterclaim. A "trade secret" under the IUTSA is: "(1) information, (3) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 723 (N.D. Ind. 2012) (quoting *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 197 (Ind. Ct. App. 2007)). Determining whether information qualifies as a trade secret is a fact-specific inquiry. *Credentials Plus, LLC v. Calderone*, 230 F. Supp. 2d 890, 900 (N.D. Ind. 2002).

Mr. Allen does not dispute that the Statoil Draft satisfies the first two requirements of a trade secret under Indiana law, to wit, that it constitutes (1) information that (2)

derives independent economic value.  He argues, however, that the information at issue is generally known and/or readily ascertainable by those in the industry and that ACBL did not use reasonable efforts to maintain its secrecy.  For the same reasons we have found that the draft contract constituted "confidential information" as defined by the Severance Agreement, we cannot say as a matter of law that the draft contract includes only information that is generally known or readily ascertainable by others in the industry.  There is also sufficient evidence in the record from which a reasonable jury could conclude that ICBL took reasonable efforts to maintain the secrecy of the ICBL-Statoil Contract, including, storing the contract electronically on a secured, password-protected database managed by its legal department and in paper form in a building that requires a security badge to enter and on a floor that is limited to designated employees, requiring employees to sign confidentiality agreements to protect its proprietary information, and including a specific confidentiality provision in the ACBL-Statoil Contract prohibiting Statoil from "disclos[ing] the terms or conditions of this Contract, including rates, to any third party without the written consent of [ACBL]."  Dkt. 66-1 § 31.

For these reasons Mr. Allen is not entitled to summary judgment on ACBL's misappropriation of trade secrets counterclaim brought pursuant to the IUTSA.

## III.  Conclusion

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment and Supplemental Motion for Summary Judgment and <u>DENY</u> Plaintiff's

Motion for Summary Judgment. The case shall proceed accordingly.

IT IS SO ORDERED.

Date: 9/20/2019

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Garry R. Adams
CLAY DANIEL WALTON & ADAMS PLC
garry@justiceky.com

Amanda Warford Edge
WYATT TARRANT & COMBS, LLP (Lousiville)
aedge@wyattfirm.com

C. Tyson Gorman
WYATT, TARRANT & COMBS LLP
tgorman@wyattfirm.com

Andrew Thomas Lay
CLAY DANIEL WALTON & ADAMS PLC
pete@justiceky.com

Sean G. Williamson
WYATT TARRANT & COMBS, LLP (Lousiville)
swilliamson@wyattfirm.com